

# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 99-31072

D.C. Docket No. 99-cv-2641 J

U.S. COURT OF APPEALS
FILED
JUN 12 2000
CHARLES R. FULBRUGE III
CLERK

U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
FILED AUG 23 2000
LORETTA G. WHYTE
CLERK

In Re: KAISER ALUMINUM AND CHEMICAL COMPANY, July 5, 1999 explosion at Kaiser Aluminum & Chemical Company, Gramercy Works Facility Subpoena Duces Tecum; ET AL

Movants

In Re: KAISER ALUMINUM AND CHEMICAL COMPANY, July 5, 1999 explosion at Kaiser Aluminum and Chemical Company, Gramercy Works Facility Subpoena Duces Tecum; TERRY DENOVA; SYLVESTER BATTISTE; KELLY DUFFY; BLACKIE LEBLANC; WILLIAM KIRSCH; DON PHILLIPS; GEORGE GUELFO; JOHN HALEY; RICHAD OSBORNE; WALTER BOUNDS; STEVEN BACALA; PETE JOHNSTON; ANTHONY VICKNAIR; GLEN LYNAGH; PATRICK HARRINGTON; BRIAN HATFIELD; WALTER HANSLEY; RUBEN COLE; KENNETH HYMEL; BRET HEBERT; SCOTT HALPHEN; JOSEPH KERRNAN; MARTY WUNSTEL; HOWARD ANDERSON

Movants - Appellants

DARRYL JACKSON; TERRY BROUILETTE; DON WILLIAMSON; BUD GARCIA; MATT MATTHEWS; SEYMOUR BROWN; WHIT CONWAY; FORREST BENGE; HERMAN FARLOUGH; DENNIS HAWES; ABE LOWE; DAVID STEELE; EARL VEAL

Appellants

v.

UNITED STATES DEPARTMENT OF LABOR, Office of Mine Safety and Health

Movant - Appellee

Appeal from the United States District Court for the
Eastern District of Louisiana, New Orleans.

Before REAVLEY, SMITH, and EMILIO M. GARZA, Circuit Judges.

J U D G M E N T

This cause was considered on the record on appeal and was argued by counsel.

It is ordered and adjudged that the judgment of the District Court is affirmed.

Fee_____
Process____
X  Dktd____
___ CtRmDep____
Doc.No. 59

      IT IS FURTHER ORDERED that appellants pay to appellees the costs on appeal to be taxed by the Clerk of this Court.

ISSUED AS MANDATE: AUG 22 2000

    A true copy
      Test.
    Clerk, U.S. Court of Appeals, Fifth Circuit

    By _____
              Deputy

New Orleans, Louisiana   AUG 22 2000

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 99-31072

_____

U.S. COURT OF APPEALS
FILED

JUN 1 2 2000

CHARLES R. FULBRUGE III
CLERK

In Re: KAISER ALUMINUM AND CHEMICAL COMPANY, July 5, 1999 explosion at Kaiser Aluminum & Chemical Company, Gramercy Works Facility Subpoena Duces Tecum; ET AL.,

             Movants,

In Re: KAISER ALUMINUM AND CHEMICAL COMPANY, July 5, 1999 explosion at Kaiser Aluminum & Chemical Company, Gramercy Works Facility Subpoena Duces Tecum; TERRY DENOVA; SYLVESTER BATISTE; KELLY DUFFY; BLACKIE LEBLANC; WILLIAM KIRSCH; DON PHILLIPS; GEORGE GUELFO; JOHN HALEY; RICHARD OSBORNE; WALTER BOUNDS; STEVEN BACALA; PETE JOHNSTON; ANTHONY VICKNAIR; GLEN LYNAGH; PATRICK HARRINGTON, BRIAN HATFIELD; WALTER HANSLEY; RUBEN COLE; KENNETH HYMEL; BRET HEBERT; SCOTT HALPHEN; JOSEPH KERNAN; MARTY WUNSTEL; HOWARD ANDERSON,

             Movants-Appellants,

DARRYL JACKSON; TERRY BROUILETTE; DON WILLIAMSON; BUD GARCIA; MATT MATTHEWS; SEYMOUR BROWN; WHIT CONWAY; FORREST BENGE; HERMAN FARLOUGH; DENNIS HAWES; ABE LOWE; DAVID STEELE; EARL VEAL,

             Appellants,

versus

UNITED STATES DEPARTMENT OF LABOR, Office of Mine Safety and Health,

             Movant-Appellee.

---

Appeals from the United States District Court for
the Eastern District of Louisiana

---

Before REAVLEY, SMITH and EMILIO M. GARZA, Circuit Judges.

REAVLEY, Circuit Judge:

Appellants Kaiser Aluminum & Chemical Co. and several of its employees (collectively Kaiser) appeal a district court order enforcing subpoenas duces tecum issued by the Department of Labor's Mine Safety and Health Administration (MSHA). Kaiser argues that MSHA does not have jurisdiction over the Kaiser facility in issue, and that certain documents are privileged. We affirm.

## BACKGROUND

Kaiser's Gramercy Works in Louisiana is a plant that processes bauxite into aluminum oxide, known as alumina. The alumina is sold to other concerns for smelting into aluminum ingots.

On July 5, 1999, there was an explosion which occurred in one of the digestion units at the plant and resulted in numerous injuries. MSHA began an investigation and decided to convene a public hearing. Under section 103(b) of the Federal Mine Safety and Health Act ("Mine Act" or "Act"), 30 U.S.C. § 813(b), MSHA may hold public hearings and issue subpoenas for the attendance of witnesses and the production of documents. The federal district courts have jurisdiction to issue orders enforcing MSHA

2

subpoenas. *Id.*

Kaiser initiated the district court proceedings below by filing a motion to quash subpoenas issued by MSHA, claiming that they were overbroad. MSHA later sought to enforce certain subpoenas. Kaiser argued that MSHA did not have jurisdiction over its facility, and that certain documents were privileged under the attorney work product and "self-evaluation" privileges.

The district court required certain procedural safeguards for the benefit of Kaiser and its witnesses, but ruled that MSHA had jurisdiction over the facility. The district judge also agreed with a magistrate judge that certain pre-accident documents were not privileged, after both had reviewed the documents *in camera*.

## DISCUSSION

A. *District Court and Appellate Jurisdiction*

This court *sua sponte* asked the parties to address appellate jurisdiction under the collateral order doctrine or another independent basis pursuant to 28 U.S.C. § 1291 or 1292. Upon further reflection and review of the record, we are satisfied that we have appellate jurisdiction under § 1291, which grants appellate jurisdiction over "all final decisions of the district courts." In general, a district court order is an appealable final decision if it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States.*[1] We are persuaded that the district court

---

[1] 324 U.S. 229, 233, 65 S. Ct. 631, 633 (1945).

3

entered a final order on October 1, 1999 disposing of the remaining matters before it, namely the manner and extent to which Kaiser must comply with the MSHA subpoenas. An order enforcing an administrative subpoena is considered a final order. *See United States v. Construction Prods. Research, Inc.*[2]

MSHA argues that while the district court ruled correctly, it should not have even addressed the scope of the Mine Act but instead should have summarily enforced the subpoenas.[3] MSHA claims that the district court exceeded its authority in entertaining Kaiser's challenge to MSHA's jurisdiction over the Kaiser plant.[4]

MSHA cites Fifth Circuit authority that district courts should handle agency subpoena requests "summarily and with dispatch," *In re Office of Inspector General*,[5] and that the district court should play a "strictly limited" role in such matters, *Sandsend Fin. Consultants, Ltd. v. FHLBB*.[6] However, we have also stated that courts will enforce an administrative subpoena if it "is within the agency's statutory authority" and other requirements are met. *United States v. Chevron U.S.A., Inc.*[7] In the circumstances

---

[2] 73 F.3d 464, 469 (2d Cir. 1996).

[3] By extension of this argument, we assume that MSHA would have us summarily affirm the district court without reviewing the scope of the Mine Act.

[4] Kaiser and MSHA disagree on whether this argument was raised below. We assume without deciding that it was raised below.

[5] 933 F.2d 276, 277 (5th Cir. 1991).

[6] 878 F.2d 875, 879 (5th Cir. 1989).

[7] 186 F.3d 644, 647 (5th Cir. 1999).

presented, we conclude that the district court had authority to decide, as a matter of statutory construction in the face of essentially uncontested facts regarding the industrial activities at the plant, whether the plant is a facility engaged in mining-related activities within the scope of the Mine Act.

B.   *Jurisdiction of MSHA over the Plant*

Kaiser argues that MSHA does not have jurisdiction over the Gramercy Works, and that instead the plant is subject to regulation by the Occupational Safety and Health Administration (OSHA). Section 4 of the Mine Act, 30 U.S.C. § 803, provides that each "coal or other mine" is subject to the provisions of the Act. "Coal or other mine" is defined under § 3(h)(1) of the Act to mean:

> (A) an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground, (B) private ways and roads appurtenant to such area, and (C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, equipment, machines, tools, or other property including impoundments, retention dams, and tailings ponds, on the surface or underground, used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits in nonliquid form, or if in liquid form, with workers underground, or used in, or to be used in, the *milling* of such minerals, or the work of preparing coal or other minerals, and includes custom coal preparation facilities. In making a determination of what constitutes mineral milling for purposes of this chapter, the Secretary shall give due consideration to the convenience of administration resulting from the delegation to one Assistant Secretary of all authority with respect to the health and safety of miners employed at one physical establishment

30 U.S.C. § 802(h)(1) (emphasis added). We agree with the Sixth Circuit that this statute provides a "'sweeping definition'" for a mine, "encompassing much more than the usual

5

meaning attributed to it." *Bush & Burchett, Inc. v. Reich.*[8]

The district court, agreeing with MSHA, concluded that the activities at the Kaiser plant constitute "milling" under the Act. There is little dispute about the industrial activities occurring at the Gramercy Works. Aluminum is produced in several stages. Bauxite, a natural ore consisting of a mixture of several minerals, is collected through surface mining. The bauxite is then subjected to the Bayer process to produce alumina. The alumina can then be smelted to produce aluminum metal.

The intermediate stage of producing alumina through the Bayer process is carried out at Kaiser's plant. Raw bauxite is mined in Jamaica, where it is screened and dried to produce a bauxite concentrate. The screening removes limestone rocks from the bauxite. The concentrate is purchased by Kaiser and delivered to its plant.

The Bayer process consists of several steps including digestion, clarification, precipitation, and calcination. In digestion, the bauxite is mixed with sodium hydroxide (caustic soda) to create a slurry or "liquor," and the slurry is then combined under high heat and pressure with steam in large vessels called digesters or digestors. This process creates a sodium aluminate solution. The solution then undergoes clarification, during which it is run through pressure reducers and heat exchangers, a settling tank, and filters, followed by precipitation (cooling and settling), and calcination (a drying process) to produce alumina, the end product at the plant. The alumina is shipped elsewhere for

---

[8] 117 F.3d 932, 936 (6th Cir. 1997) (quoting *Donovan v. Carolina Stalite Co.*, 734 F.2d 1547, 1554 (D.C. Cir. 1984)).

smelting into aluminum metal.

The issue presented is whether the alumina production process employed at the plant constitutes "milling" under the Act. Milling is not defined in the statute; instead, under § 3(h)(1) quoted above, Congress expressly delegated to the Secretary of Labor authority to determine "what constitutes mineral milling for purposes" of the Act. We agree with the District of Columbia Circuit that this language "gives the Secretary discretion, within reason, to determine what constitutes mineral milling, and thus indicates that his determination is to be reviewed with deference . . . by . . . the courts. . . . In this highly technical area deference to the Secretary's expertise is especially appropriate." *Donovan*, 734 F.2d at 1552 & n.9.

When the language of a statute is unambiguous, we "must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*[9] In matters of statutory construction made by an agency entrusted to administer a statute, if Congress has not directly addressed the precise question at issue, the court should defer to the agency's interpretation as long as it is reasonable. "[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 844, 104 S. Ct. at 2782. An interpretation is reasonable so long as it is not "arbitrary, capricious, or manifestly contrary to the statute." *Id.*

---

[9] 467 U.S. 837, 843, 104 S. Ct. 2778, 2781 (1984).

Kaiser is correct that the statute excludes liquid extraction of minerals unless the extraction takes place with workers underground. There is no underground extraction which takes place at the Gramercy Works. Instead alumina is "extracted" at a surface facility, using a chemical process involving liquid stages, as discussed above. But the statute by its terms covers a mine where the extraction of any nonliquid mineral, such as bauxite, takes place, as well as any facility where the milling and preparing of "such minerals" takes place. So the issue is whether the Bayer Process constitutes "milling" of solid bauxite ore.

Kaiser argues that, unlike other alumina companies, it does no crushing of bauxite at its plant. Webster's Dictionary explains that the origin of the word "mill" goes back to the Latin "mola" for mill or millstone. The first definition is "a building provided with machinery for grinding grain into flour." "Mill" can also mean "a machine for crushing or comminuting some substance," and "to crush or grind (ore) in a mill."[10] Kaiser also cites a dictionary of mining and mineral terms, published by the American Geological Institute, defining a mill as a "plant in which crushing, wet grinding, and further treatment of ore is conducted," and "a place or a machine in which ore or rock is crushed."[11] Under these definitions, the Bayer process of alumina production does not much sound like milling.

---

[10] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1434 (Phillip B. Gove ed., 1968).

[11] AMERICAN GEOLOGICAL INST., DICTIONARY OF MINING, MINERAL, AND RELATED TERMS 344 (2d ed. 1996).

8

Kaiser insists that the liquid-based alumina extraction process, i.e. the Bayer process, is "refining," not "milling," and that refining facilities are regulated by OSHA. Kaiser cites various published materials referring to the Bayer process as a "refining" process. Under a 1979 Interagency Agreement between OSHA and MSHA, and a 1974 Memorandum of Understanding between OSHA and the Mining Enforcement and Safety Administration (the predecessor to MSHA), "refining" falls within OSHA's jurisdiction, since by the terms of these agreements refining "[c]ommences at the point where milling, as defined, is completed, and material enters the sequential processes to produce a product of higher purity."[12]

Despite these arguments, we cannot say that MSHA's statutory interpretation of milling is unreasonable under *Chevron*. At the outset, we note that the Interagency Agreement expressly includes alumina plants within the jurisdiction of MSHA. Despite some general language ceding regulation of "refining" to OSHA, the Agreement could not be more clear that "[p]ursuant to the authority in section 3(h)(1) to determine what constitutes mineral milling . . . MSHA jurisdiction includes . . . alumina and cement plants."[13]

MSHA cites a dictionary of mining and mineral terms published by the U.S. Department of Interior which gives a definition of mill as any facility that reduces ores by

---

[12] Interagency Agreement, 44 Fed. Reg. 22,827, 22,830 (1979); Memorandum of Understanding Between MESA and OSHA, 39 Fed. Reg. 27,384, 27,384 (1974).

[13] Interagency Agreement, at 22,827.

9

means other than smelting.[14] MSHA also cites the dictionary of mining and mineral terms published by the American Geological Institute, discussed above, which again includes a definition of mill as any facility for reducing ores by means other than smelting, as well as a definition as a facility where "metal ore is cleaned, concentrated, or otherwise processed before it is shipped to the customer, refiner, smelter, or manufacturer."[15] A facility employing the Bayer process falls under these definitions, since this process does not involve smelting, and the end product, alumina, must be sent to a smelter to produce aluminum metal.

Kaiser suggests that "milling" under the statute applies to physical processes only, and that the Bayer process is a chemical process whereby the chemical composition of the mineral is altered. The statute by its terms does not exclude chemical processes. MSHA cites legislative history of the Mine Act from a senate report that "it is the Committee's intention that what is considered to be a mine and to be regulated under the Act be given the broadest possible interpretation," and "that doubts be resolved in favor of inclusion of a facility within the coverage of the Act."[16] A house report cites dangers associated with mining to include poisonings caused by "milling operations where the ore is liquified and

---

[14] U.S. DEPT. OF THE INTERIOR, A DICTIONARY OF MINING, MINERAL, AND RELATED TERMS 706 (Paul W. Thrush & Staff of the Bureau of Mines eds., 1968).

[15] AMERICAN GEOLOGICAL INST., DICTIONARY OF MINING, MINERAL, AND RELATED TERMS 344 (2d ed. 1996).

[16] S. Rep. No. 95-181, at 14 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3401, 3414.

then vaporized and condensed," and the "chemical processing of ores."[17]

Kaiser argues that *Herman v. Associated Elec. Coop., Inc.*[18] is "dispositive." In *Herman*, the defendant operated an electric utility plant. It purchased crushed coal for its plant from two mines, and at the plant removed debris and further crushed the coal for burning in its generator units. The court held that the facility was not a mine under the Mine Act. The court reasoned that "[t]he Act was designed primarily to protect miners, not employees of coal purchasers such as electric utilities and steel mills," *id.* at 1082, and that the utility "purchased coal that was processed into a marketable form by the mine," *id.* at 1083. We do not entirely agree with the majority opinion of the Eighth Circuit in *Herman* and distinguish the facts from our present case because the electric utility there was not in the business of selling a raw or processed mineral product. An electric utility sells electricity. The coal was used as an end product at the plant, and hence the utility was the final consumer of the coal. In contrast, Kaiser is in the business of processing, or as MSHA claims, "milling," a mineral product for sale to others. *Herman* did not address whether the electric utility engaged in milling under the statute.

C.   *Privilege Issue*

Kaiser claims that certain documents of the "Overpressure Protection Committee" were privileged, and that the district court misapplied the legal standards applicable to the

---

[17] H.R. Rep. No. 95-312, at 10-11 (1977), *reprinted in* SUBCOMMITTEE ON LABOR OF THE SENATE COMM. ON HUMAN RESOURCES, 95TH CONG., LEGISLATIVE HISTORY OF THE FEDERAL MINE SAFETY AND HEALTH ACT OF 1977, at 366, 368-69 (1978).

[18] 172 F.3d 1078 (8th Cir. 1999).

privilege issue. This committee was formed by Kaiser in the late 1970's to study the existing pressure vessels used at the Gramercy Works, and determine how procedures could be improved and liability minimized. It is unclear from the record and briefs whether the documents in issue were prepared by the committee itself or were prepared by others and presented to the committee for its review. The documents in issue are not a part of the appellate record.

Both the magistrate judge and the district judge reviewed the documents *in camera*, and ordered the disclosure of certain documents that were prepared before the accident. Kaiser claims that the documents were privileged under the work product and "self-evaluation" privileges.

The work product privilege applies to documents "prepared in anticipation of litigation." Fed. R. Civ. P. 26(b)(3). The law of our circuit is that the privilege can apply where litigation is not imminent, "as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation." *United States v. El Paso Co.*[19] Kaiser argues that the district court erred in applying this "primary purpose" test. The court correctly followed Fifth Circuit precedent..

As for the self-evaluation privilege,[20] Fed. R. Evid. 501 states that privileges "shall be governed by the principles of the common law as they may be interpreted by the courts

---

[19] 682 F.2d 530, 542 (5th Cir. 1982) (quoting *United States v. Davis*, 636 F.2d 1028, 1040 (5th Cir. Unit A 1981)).

[20] The self-evaluation privilege is also known as the "self-critical analysis" privilege and the "self-evaluative" privilege.

12

of the United States in the light of reason and experience." Privileges "are not lightly created nor expansively construed, for they are in derogation of the search for truth." *United States v. Nixon*.[21] The Fifth Circuit has not recognized the self-evaluation privilege, and "courts with apparent uniformity have refused its application where, as here, the documents in question have been sought by a governmental agency." *FTC v. TRW, Inc.*[22] The Ninth Circuit, in rejecting application of the privilege, also noted that "the difference between pre-accident safety reviews and post-accident investigations is an important one." *Dowling v. American Hawaii Cruises, Inc.*[23] We need not decide whether a self-evaluation privilege should ever be recognized. We decline to recognize such a privilege in the circumstances presented, namely a case where a government agency seeks pre-accident documents.

AFFIRMED.

---

[21] 418 U.S. 683, 710, 94 S. Ct. 3090, 3108 (1974).

[22] 628 F.2d 207, 210 (D.C. Cir. 1980).

[23] 971 F.2d 423, 427 (9th Cir. 1992).